IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THREE FRIENDS, INC. d/b/a
WOW TOBACCO & GROCERY,

    *Plaintiff*,

    v.                                  Civil Action No. ELH-20-2649

UNITED STATES OF AMERICA,

    *Defendant*.

**MEMORANDUM OPINION**

This case arises under the Supplemental Nutrition Assistance Program ("SNAP" or the "Program") and concerns the penalty of permanent disqualification imposed on plaintiff Three Friends, Inc., d/b/a Wow Tobacco & Grocery ("Wow" or the "Store"), a SNAP retailer. The disqualification was premised on a "trafficking" violation.

SNAP was established pursuant to the Food Stamp Act of 1964, as amended, 7 U.S.C. § 2011 *et seq.* (the "Act"). It is administered by the Food and Nutrition Service ("FNS" or the "Agency"), which is part of the U.S. Department of Agriculture ("USDA"). *See* 7 C.F.R. § 271.3.[1] FNS determined that plaintiff engaged in the trafficking of SNAP benefits when, on one occasion, an employee exchanged benefits for cash. Although plaintiff sought a warning letter or, alternatively, a civil money penalty ("CMP"), FNS determined to permanently disqualify plaintiff from participation in the Program. *See* 7 U.S.C. § 2021(a); 7 C.F.R. § 278.6. A Final Agency Decision, issued on August 13, 2020, upheld that decision. *See* ECF 16-2 at 143-51 ("Final Agency Decision" or "FAD").

---

[1] The Program was originally referred to as the "Food Stamp Program." *See* the Food Stamp Act of 1964, H.R. 10222, 88th Cong. § 3(k) (1964). In 2008, Congress replaced the "Food Stamp Program" with the "Supplemental Nutrition Assistance Program." *See* Food, Conservation, and Energy Act of 2008, H.R. 6124, 110th Cong. § 4001 (2008).

Thereafter, plaintiff filed suit against the United States (ECF 1, the "Complaint"), seeking judicial review of the FAD.  The Complaint contains two counts. In Count I (*id.* ¶¶ 33-41), pursuant to 7 U.S.C. § 2023 and 7 C.F.R. § 279.7, plaintiff seeks "Judicial Review of Defendant's permanent disqualification of Plaintiff from the SNAP program."  ECF 1, ¶ 41.  The Complaint asks the Court, *inter alia*, to reverse the FAD, vacate FNS's initial determination as to the violation and penalty, direct defendant to send a warning letter in lieu of permanent disqualification, and to reinstate plaintiff as an approved participant in SNAP.  *Id.*  Count II (*id.* ¶¶ 42-49) likewise seeks "Judicial Review of Defendant's permanent disqualification of Plaintiff from the SNAP program."  *Id.* ¶ 49.  And, plaintiff asks the Court to impose a CMP, in lieu of permanent disqualification.  *Id.*  The Complaint is accompanied by the FAD.  ECF 1-1.

The United States (the "government") has moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment.  ECF 16.  The motion is supported by a memorandum.  ECF 16-1 (collectively with ECF 16, the "Motion").  In addition, defendant has submitted the Administrative Appeal Record ("Administrative Record").  ECF 16-2 at 3-152.[2]

Plaintiff has responded in opposition.  ECF 23 (the "Opposition").  Notably, in the Opposition, plaintiff "adopts and incorporates by reference" the statement of facts in the Motion, and the Administrative Record.  ECF 23 at 3.  The government has replied.  ECF 26 (the "Reply").

---

[2] Along with the Administrative Record, the government has provided a Declaration from the Chief of the Administrative Review Branch of the FNS Retailer Policy and Management Division. She avers that the Administrative Record is the entire record considered by FNS in reaching the FAD. ECF 16-2 at 2.

In referencing the Administrative Record, I cite to the ECF pagination. A portion of the Administrative Record has been redacted because it contains sensitive federal income tax information. But, an unredacted version was provided to the Court. *See* ECF 16-1 at 8 n.2.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall construe the Motion as one for summary judgment and grant it.

## I. Factual Background

### A.  SNAP

SNAP was enacted "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." 7 U.S.C. § 2011. To achieve that mission, SNAP provides qualifying individuals and families with supplemental funds to purchase eligible items from approved retailers. *Id.* §§ 2013, 2018; 7 C.F.R. § 278.1.

Beneficiaries of SNAP are provided with benefits by way of an Electronic Benefits Transfer ("EBT") card. *See* 7 U.S.C. § 2016(j)(1)(A). The EBT card operates like a debit card. But, it may only be used to buy designated food items from authorized SNAP retailers. *Id.* § 2013(a); *see also* 7 C.F.R. § 271.2 (defining "eligible foods" as, in pertinent part, "[a]ny food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption"); 7 U.S.C. § 2018 ("Approval of Retail Food Stores and Wholesale Food Concerns"); 7 C.F.R. § 278.1 (same).

Notably, "trafficking" in SNAP benefits is prohibited. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). "Trafficking" is defined, in pertinent part, as "buying, selling, stealing or otherwise effecting an exchange of SNAP benefits issued and accessed" via EBT cards "for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone." 7 C.F.R. § 271.2.

Periodically, FNS reviews authorized retailers and may disqualify an approved retail store that violates the Act or its implementing regulations.   In particular, 7 U.S.C. § 2021(a) provides (bold in original):

**(a) Disqualification**

   **(1) In general**

An approved retail food store or wholesale food concern that violates a provision of this chapter or a regulation under this chapter may be –

   (A) disqualified for a specified period of time from further participation in the supplemental nutrition assistance program;

   (B) assessed a civil penalty of up to $100,000 for each violation; or

   (C) both.

   **(2) Regulations**

Regulations promulgated under this chapter shall provide criteria for the finding of a violation of, the suspension or disqualification of and the assessment of a civil penalty against a retail food store or wholesale food concern on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system.

SNAP regulations require FNS to consider three factors in making a disqualification or penalty determination: "(1) The nature and scope of the violations committed by personnel of the firm, (2) Any prior action taken by FNS to warn the firm about the possibility that violations are occurring, and (3) Any other evidence that shows the firm's intent to violate the regulations."  7 C.F.R. § 278.6(d).  However, the Agency's discretion, and its consideration of these factors, is sharply circumscribed when it comes to trafficking.

Originally, the Food Stamp Act of 1964 left the issue of disqualification for trafficking violations to the discretion of the Secretary of USDA (the "Secretary"). *See Corder v. United*

*States*, 107 F.3d 595 (8th Cir. 1997) (discussing statutory history of Food Stamp Program); *Ghattas v. United States*, 40 F.3d 281, 283-84 (8th Cir. 1994) (same); *Ahmed v. United States*, 47 F. Supp. 2d 389, 393 (W.D.N.Y. 1999) (same). From 1982 to 1988, the Act precluded the exercise of any discretion and mandated permanent disqualification for trafficking violations. *See Castillo v. United States*, 989 F. Supp. 413, 417 (D. Conn. 1997). But, in 1988, Congress amended the statute, conferring discretion on the Secretary to impose a monetary penalty in lieu of permanent disqualification, but only under certain circumstances. *See* Hunger Prevention Act of 1988, S. 2560, 100th Cong. § 344, 102 Stat. 1645, 1664 (1988); *Ahmed*, 47 F. Supp. 2d at 391.[3]

Section 2021(b)(3)(B) of 7 U.S.C. provides:

[D]isqualification ... shall be ... (3) permanent upon ... (B) the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons…except that the Secretary shall have the discretion to impose a civil penalty of up to $20,000 for each violation…in lieu of disqualification under this subparagraph,… if the Secretary determines that there is substantial evidence that such store or food concern had an effective policy and program in effect to prevent violations of the chapter and the regulations, including evidence that—

(i) the ownership of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; and

(ii)(I)   the management of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; or

(II)   the management was aware of, approved of, benefited from, or was involved in the conduct of no more than 1 previous violation by the store or food concern…

The legislative history pertinent to § 2021(b) addressed the reasons for the inclusion of the civil money penalty as a possible sanction.  A CMP in lieu of permanent disqualification is

---

[3] The Secretary's functions have been delegated to FNS. *See* 7 C.F.R. § 271.3.

sometimes referred to as a "trafficking CMP."  H.R. Rep. No. 100-828, pt. 1, at 27–28 (1988)

states (emphasis added):

> *The permanent disqualification of retail food stores upon the first trafficking offense—without any evaluation of preventive measures taken or complicity in the trafficking—seems excessively harsh.* The Committee substitute gives the Secretary of Agriculture the discretion to impose a fine of up to $20,000 on a retail or wholesale food store instead of disqualification. The Secretary may exercise that discretion—if it is determined that there is substantial evidence that the store had an effective policy and program to prevent these violations of the Food Stamp Act.
>
> Examples of an effective policy and program to prevent violations of the Act or regulations by a store or concern might include the following: (i) effective written policies and procedures to be followed by store personnel that are consistently applied by management; (ii) initial training of store managers and employees in the proper handling of food stamps; (iii) periodic oversight and continuing education of store personnel in the proper handling of food stamps; and (iv) other reasonable and good faith efforts that demonstrate the existence of an effective policy and program by the store or concern to prevent violations of the act or regulations.
>
> A retail food store or wholesale food concern which has an effective policy and program to prevent trafficking should not be presumptively disqualified from participation in the Food Stamp Program due to the unauthorized or expressly prohibited acts of store personnel ....
>
> However, innocent persons should not be subject to the harsh penalty of disqualification where a store or concern has undertaken and implemented an effective program and policy to prevent violations. The Secretary of Agriculture is directed to promulgate regulations consistent with the described amendment….
>
> This provision provides [the Secretary with discretion]. The Act will retain strict penalties—fines can be imposed as well as disqualification from participation in the food stamp program. With Secretarial discretion, we can be assured that the punishment will more closely fit the crime.

The regulations implementing SNAP provide that FNS "shall...[d]isqualify a firm

permanently if: (i) Personnel of the firm have trafficked as defined in [7 C.F.R.] § 271.2…." 7

C.F.R. § 278.6(e)(1)(i). A disqualification "shall result from a finding of a violation on the basis

of evidence that may include facts established through on-site investigations, inconsistent

redemption data, [or] evidence obtained through a transaction report under an electronic benefit transfer system…." 7 C.F.R. § 278.6(a); *see* 7 U.S.C. § 2021(a)(2); *AJS Petroleum, Inc. v. United States*, L-11-1085, 2012 WL 683538, at *1 (D. Md. Mar. 1, 2011).  But, even if an authorized retailer is found to have trafficked in benefits, disqualification is not the only sanction. The FNS may impose a civil money penalty, in lieu of permanent disqualification, so long as it acts "in accordance with the provisions of § 278.6(i) and § 278.6(j)." 7 C.F.R. § 278.6(a).

To qualify for a CMP, however, the retailer must request this alternative penalty within ten days of receipt of the charge letter from FNS. *See* 7 C.F.R. § 278.6(b)(2)(iii).  In addition, the retailer must submit "substantial evidence" showing that the retailer meets multiple criteria.  *See Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004); *Castillo*, 989 F. Supp. at 418 ("All four of these criteria must be satisfied [by substantial evidence] in order to impose a [CMP].").

The criteria are as follows, 7 C.F.R. § 278.6(i):

Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and

Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and

Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations . . . .

Moreover, 7 C.F.R. § 278.6(i) provides additional detail as to Criterion 1 and Criterion 3.

Regarding Criterion 1, § 278.6(i)(1) states:

(1) Compliance policy standards. As specified in Criterion 1 above, in determining whether a firm has established an effective policy to prevent violations, FNS shall consider written and dated statements of firm policy which reflect a commitment to ensure that the firm is operated in a manner consistent

with this part 278 of current FSP regulations and current FSP policy on the proper acceptance and handling of food coupons. As required by Criterion 2, such policy statements shall be considered only if documentation is supplied which establishes that the policy statements were provided to the violating employee(s) prior to the commission of the violation. In addition, in evaluating the effectiveness of the firm's policy and program to ensure FSP compliance and to prevent FSP violations, FNS may consider the following:

(i)      Documentation reflecting the development and/or operation of a policy to terminate the employment of any firm employee found violating FSP regulations;

(ii)     Documentation of the development and/or continued operation of firm policy and procedures resulting in appropriate corrective action following complaints of FSP violations or irregularities committed by firm personnel;

(iii)    Documentation of the development and/or continued operation of procedures for internal review of firm employees' compliance with FSP regulations;

(iv)     The nature and scope of the violations charged against the firm;

(v)      Any record of previous firm violations under the same ownership; and

(vi)     Any other information the firm may present to FNS for consideration.

As for Criterion 3, § 278.6(i)(2) provides:

(2) Compliance training program standards. As prescribed in Criterion 3 above, the firm shall have developed and implemented an effective training program for all managers and employees on the acceptance and handling of food coupons in accordance with this part 278. A firm which seeks a civil money penalty in lieu of a permanent disqualification shall document its training activity by submitting to FNS its dated training curricula and records of dates training sessions were conducted; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s). FNS shall consider a training program effective if it meets or is otherwise equivalent to the following standards:

(i)      Training for all managers and employees whose work brings them into contact with SNAP benefits or who are assigned to a location where SNAP benefits are accepted, handled or processed shall be conducted within one month of the institution of the compliance policy under Criterion 1 above. Employees hired subsequent to the institution of the compliance policy shall be trained within one month of employment. All employees shall be trained periodically thereafter;

8

(ii)   Training shall be designed to establish a level of competence that assures compliance with Program requirements as included in this part 278;

(iii)   Written materials, which may include FNS publications and program regulations that are available to all authorized firms, are used in the training program. Training materials shall clearly state that the following acts are prohibited and are in violation of the Food and Nutrition Act of 2008 and regulations: the exchange of food coupons, ATP cards or other program access devices for cash; and, in exchange for coupons, the sale of firearms, ammunition, explosives or controlled substances, as the term is defined in section 802 of title 21, United States Code.

The SNAP regulations provide as a general matter that FNS may elect to send a warning letter "if violations are too limited to warrant a disqualification." *Id.* § 287.6(e)(7). But, such an option does not apply in the context of trafficking. *See* 7 U.S.C. § 2023(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697 ("[A] store that is caught trafficking in food stamps even one time must be permanently disqualified from the Food Stamp Program, unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy.").

Generally, the SNAP regulations also contemplate a "hardship waiver," under which "FNS may impose a civil money penalty as a sanction in lieu of disqualification when the firm subject to a disqualification is selling a substantial variety of staple food items, and the firm's disqualification would cause hardship to SNAP households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices." 7 C.F.R. § 278.6(f). However, such a CMP "may not be imposed in lieu of a permanent disqualification." *Id.*

The regulations provide for a system of administrative and judicial review of a decision by FNS to disqualify a SNAP retailer. *See* 7 U.S.C. § 2023(a); 7 C.F.R. § 279. First, FNS must provide the retailer with written notice of its initial decision. 7 U.S.C. § 2023(a)(1). Within ten days of receipt of the notice, the retailer may ask FNS to review the decision. *Id.* § 2023(a)(3); 7

C.F.R. § 279.1. FNS must then review its initial decision and render a Final Agency Decision, which takes effect thirty days after notice of the decision has been delivered to the retailer. 7 C.F.R. § 279.5. Upon receipt of a Final Agency Decision, a retailer may seek judicial review. 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.7.

### B.  Factual Summary[4]

Plaintiff is a privately held corporation that operates a retail convenience store located in Baltimore.  ECF 16-2 at 3-4.  Its owners include Manpreet Singh, Muhammad Rizwan Yousaf, and possibly Shafaqat Ali.  *Id*. at 7-8.[5]  According to plaintiff's SNAP application, the Store opened for business on December 30, 2016.  *Id*. at 24.  Photographs taken of the Store as part of a SNAP site visit in March 2017 indicate a typical urban convenience store selling a wide variety of products.  *Id*. at 59-82.  FNS data reflects that plaintiff generated about $146,000 in total retail sales in tax year 2017.  *Id*. at 13.

Plaintiff applied for SNAP authorization in January 2017.  *Id*. at 24-29.  As part of this application process, Singh, on behalf of plaintiff, signed a certification "confirming [his] understanding of and agreement with," *inter alia*, the following, *id*. at 29 (emphasis added):

- "I will receive Supplemental Nutrition Assistance Program training materials upon authorization. It is my responsibility to ensure that the training materials are reviewed by all firm's owners and all employees . . . and that all employees will follow Supplemental Nutrition Assistance Program regulations."

- "I am aware that violations of program rules can result in administrative action such as fines, sanctions, withdrawal, or disqualification from the Supplemental Nutrition Assistance Program . . . ."

---

[4] The facts here are drawn from the Administrative Record (ECF 16-2), which plaintiff has adopted and incorporated by reference (ECF 23 at 3).

[5] Plaintiff has asserted that Singh and Yousaf bought Ali's shares and are the only current owners. ECF 1, ¶ 12; ECF 16-2 at 106. Defendant argues that this claim is without evidence (ECF 16-1 at 8), although it appears in Singh's Affidavit submitted to FNS. ECF 16-2 at 106. Regardless, this issue is not material. Ali's first name is also sometimes spelled "Shafquat." *Id*.

- "*I accept responsibility on behalf of the firm for violations of the Supplemental Nutrition Assistance Program regulations, including those committed by any of the firm's employees*, paid or unpaid, new, full-time or part-time. *These include violations such as, but not limited to: . . . Trading cash for Supplemental Nutrition Assistance Program benefits (i.e. trafficking) . . . .*"

At first, FNS was unable to process plaintiff's application because of missing documentation. ECF 16-2 at 37-38. However, plaintiff supplied this information (*id*. at 39-57), and Wow was authorized by April 2017. *See id*. at 5.

The record does not reflect any interactions of significance between plaintiff and the Agency until March 2020. Between March 6, 2020 and March 11, 2020, an undercover FNS investigator visited the Store five times. *Id*. at 83-93 (the "Report of Positive Investigation").

According to the investigator, on March 6, 2020, he visited another store, and the clerk there "'recommended'" that the investigator talk to a clerk at Wow "'by the name of Bako,'" who "'could buy [the investigator's] EBT benefits for cash.'" *Id*. at 84. The record does not reflect what prompted the clerk at the first store to refer the investigator to Wow or Bako, nor does it reflect the relationship, if any, between the two stores. *See id*. Thereafter, the investigator visited Wow, where he spoke to a clerk who identified himself as "'Ali.'" *Id*. After the investigator asked for Bako, "'Ali responded that he had just left and to come back tomorrow morning so Bako could help [the investigator] with cash for [his] EBT benefits.'" *Id*. The investigator then left. *Id*.

The investigator visited the Store again on March 7, 2020, and spoke with a person who identified himself as "Bako." *Id*. at 86.[6] At the time, the investigator's EBT card had a SNAP

---

[6] The name "Bako" is redacted on certain pages of the publicly docketed version of the Report of Positive Investigation. *See* ECF 16-2 at 86, 92. Although I cite generally to the public version, I sometimes rely on the unredacted version for the name "Bako." The Statement of Facts in the Motion uses Bako's name when recounting the events described in ECF 16-2 at 86, 92.

balance of $913.93.  ECF 16-2 at 86.  The investigator told Bako that he "'needed cash from [his] food stamps off [his] EBT card.'"  *Id*.  He then asked Bako if "'he wanted to use the food stamps from [his] EBT card to go shopping.'"  *Id*.  Bako "'confirmed and said that he would use the food stamps from [the investigator's] EBT card to go shopping and then give [him] cash in exchange.'"  *Id*.  Bako told the investigator to buy a food item from the Store so "'as to check the EBT card balance.'"  *Id*.  Bako rang up the item, gave the investigator the receipt "momentarily," and then "'requested it back.'"  *Id*.  Bako "'checked [the] EBT card balance on the receipt and stated that he needed to kept [sic] it.'"  *Id*.  Then, he "'reached in the left pocket of his pants and gave [the investigator] $150.00 cash in advance.'"  *Id*.  Bako told the investigator to return Monday (i.e., March 9, 2020) to pick up the EBT card.  *Id*.

The investigator prepared an "Investigative Transaction Report" as to his visit to the Store on March 7, 2020, which provided a basic physical description of the individual.  *Id.* at 87.  The report indicated that the investigator had identified the person "[t]hrough conversation."  *Id*.

The investigator returned to the Store on March 9, 2020.  *Id.* at 88.  At that time, he spoke with the clerk, who had identified himself as Ali.  *Id*.  "Ali stated that Bako had not come to work" that day but should be at the Store tomorrow, *i.e.*, March 10, 2020.  *Id*.  Ali also provided the investigator with Bako's phone number.  *Id*.

The investigator again visited the Store on March 10, 2020.  *Id.* at 90.  He spoke with Ali, who said that Bako had not come to work because he was sick, and he (Ali) did not know when Bako would be returning.  *Id*.  The investigator left the Store and called Bako, using the phone number that Ali had provided.  ECF 16-2 at 90.  Bako told the investigator he was sick, but would try to use the EBT card that day or the next.  *Id*.  Bako also said that he would try to be at

---

And, there is no dispute among the parties that Bako is the person in question. *See* ECF 23 at 3. Therefore, quoting the unredacted version is appropriate in this context.

the Store the next day, *i.e.*, March 11, 2020.  *Id.*  The investigator checked his EBT transaction history and learned that Bako had used $41.68 in SNAP benefits from the EBT card in one transaction on March 8, 2020.  *Id.*

On March 11, 2020, the investigator called Bako three times, but Bako did not answer. *Id.* at 92.  The investigator checked his EBT transaction history, which showed no further use of SNAP benefits after the March 8 transaction.  *Id.*  In total, Bako exchanged $150 in cash for use of an EBT card with a SNAP balance of $913.93.  However, he apparently only used $41.68 in SNAP benefits.

FNS issued a "Charge Letter" to plaintiff on April 16, 2021.  *Id.* at 96-97 (the Charge Letter).  The Charge Letter included a copy of the investigator's Report of Positive Investigation, which recounted the events set forth above.  *Id.* at 96.  Further, the Charge Letter informed plaintiff that this report "contains evidence that violations of the Supplemental Nutrition Assistance Program (SNAP) regulations have occurred in your firm."  *Id.*  And, the Charge Letter informed plaintiff that Wow "is charged with trafficking," for which the sanction is permanent disqualification.  *Id.*

However, plaintiff was advised that it could provide "any information, explanation, or evidence . . . regarding these charges" within ten calendar days, and that a final decision would be made thereafter.  *Id.* at 97.  In addition, the Charge Letter explained that, "under certain conditions, FNS may impose a civil money penalty (CMP) of up to $59,000 in lieu of permanent disqualification of a firm for trafficking."  *Id.* at 96.  Further, plaintiff was informed that in order to receive a CMP, it would have to meet each of the four criteria listed in 7 C.F.R. § 287.6(i), and "provide the documentation as specified," due within ten calendar days.  ECF 16-2 at 96.  And, it indicated that if plaintiff qualified for a CMP, the amount of the penalty would be $30,600.  *Id.*

Plaintiff timely contested the Charge Letter, through counsel, via a letter of May 1, 2020. *Id*. at 101-09. The letter was accompanied by an Affidavit of Singh, as co-owner of the Store (*id*. at 106-07); a list of "Management and Personnel" (*id*. at 108); and two photographs of a "SNAP EBT Do's and Don't for Cashiers" poster, located in the Store. *Id*. at 109.

In his Affidavit, Singh averred: "From the very beginning, we have taken our obligations to follow the SNAP benefits program's regulations extremely seriously." *Id*. at 106. Further, Singh averred that he was "responsible for ensuring that store employees are trained to learn, understand, and abide by SNAP regulations," and he personally explained SNAP rules to new clerks "orally," with clerks required to demonstrate to Singh "that they understand them and will follow them." *Id*. at 106. Singh asserted that he had also posted the SNAP sign depicted in the photographs in the Store "since the store first began accepting EBT payments." *Id*.

Singh explained that he first learned of the trafficking violation via the Charge Letter. *Id*. He acknowledged that the allegation was "quite serious" and constituted "a violation of [the] store policy," but claimed it was made by an "errant employee," Souleymane "Bakko" Diallo, who "exceeded the scope of his authority" and violated Store rules "and the law." *Id*. at 106-07.[7] Moreover, after Diallo admitted to the events described in the investigator's report, he was terminated. *Id*. Singh concluded by noting that he owned two additional convenience stores besides the Store, and that this was the first time any of them had "faced any allegation of impropriety." ECF 16-2 at 106-07.

---

[7] The FNS investigator used the spelling "Bako." ECF 16-2 at 83-93.

Although Diallo's name is redacted in the redacted public versions of the Affidavit and plaintiff's letter of May 1, 2020 (*see* ECF 16-2 at 102, 107), it is used in the public and undisputed Statement of Facts in the Motion when describing the content of the May 1 letter (*see* ECF 16-1 at 11), as well as in plaintiff's subsequent May 18, 2020 letter, which has not been redacted (*see* ECF 16-2 at 117). *See supra* note 6.

The letter sent by plaintiff's counsel repeated the content of Singh's Affidavit. *Id*. at 101-02. According to the letter, "Mr. Singh acknowledge [sic] that the alleged transaction constitutes trafficking in violation of 7 USC § 2021. Nevertheless, these actions are neither authorized nor condoned by Mr. Mr. [sic] Singh." *Id*. at 102.

The remainder of the letter provided a "Legal Analysis" as to why plaintiff should receive a CMP rather than permanent disqualification. *Id*. at 103-05. For Criterion 1 (an effective compliance policy), counsel discussed each of the six factors enumerated in 7 C.F.R. § 278.6(i)(1), emphasizing, *inter alia*, that this was plaintiff's first SNAP violation; the offending employee was immediately terminated; plaintiff had also engaged legal counsel and conducted remedial training in response; and the Store had a "Do's and Don'ts" sign. ECF 16-2 at 103-04. For Criterion 2 (compliance policy and program in effect prior to the violation), the letter said: "As stated in the attached sworn affidavit, the compliance policy and training program have been in place since the store first started accepting EBT payments in late 2016 or early 2017." *Id*. at 104. For Criterion 3 (effective personnel training program), the letter referenced the enclosed list of Store personnel, asserting Diallo had been trained by Singh upon commencing his employment. *Id*. According to the letter, the training "is designed to ensure compliance with applicable rules and regulations"; the Store's written materials "include the rules – Do's and Don't for Cashiers – that are provided to each employee and displayed behind the counter"; and these rules are based on "FNS publications that inform store owners of the necessary training of employees." *Id*. Finally, as to Criterion 4 (no knowledge or involvement by firm ownership), the letter asserted that the Store's owners "were not aware of" the actions of the employee until they received the FNS letter, and they "did not conduct or approve of [Diallo's] actions and in no way did they benefit." *Id*. at 105.

15

As noted, the letter also included a list of "Wow Tobacco & Grocery Management and Personnel," including their respective positions, names, and dates of hire.  *Id*. at 108.  In particular, the list contained three names: co-owners Singh and Muhammad and cashier Diallo. *Id*.[8]  Diallo was listed as hired in 2017 and terminated in 2020.  *Id*.  The list did not include anyone named "Ali," despite the fact that the investigator claimed to have interacted with a clerk who identified himself by that name.  *See id*. at 83-93.  This discrepancy has never been addressed by plaintiff.  *See* ECF 16-1 at 11-12.

FNS analyzed the information submitted by plaintiff in an internal "Retailer Reply and Case Sanction Recommendation."  ECF 16-2 at 110-12 (the "Recommendation").  However, this document was never released to plaintiff, and was unknown to plaintiff until it was included in the Administrative Record with the Motion.  *See* ECF 23 at 7-8.  The Recommendation summarized the allegations and response, and noted that the firm "conceded" the events in question, that there was no "previous compliance history," and that a hardship CMP was inapplicable.  ECF 16-2 at 110-11.  According to the Recommendation, to allow Store ownership to "disclaim accountability" for acts of persons chosen to handle Store business would "render virtually meaningless" SNAP enforcement provisions.  *Id*. at 111.  The Recommendation also asserted that plaintiff's list of store personnel was incomplete, given its exclusion of "Ali."  *Id*.

As to plaintiff's CMP request, the Recommendation concluded that plaintiff had not "satisfied the regulatory requirements" needed for a CMP in lieu of permanent disqualification for trafficking.  ECF 16-2 at 112.  The Recommendation determined that plaintiff only satisfied Criterion 4.  *Id*.  For Criterion 1, the Recommendation found that plaintiff provided insufficient

---

[8] Again, although Diallo's name is redacted in the redacted public version of the list of personnel (*see* ECF 16-2 at 108), it is used in the public and undisputed Statement of Facts in the Motion when describing the content of the list of personnel (*see* ECF 16-1 at 11-12). *See supra* notes 6, 7.

evidence based on its assertion of a poster and a conversation as to program rules "at some point in the past," without any other documents "describing the scope of the training and policy." *Id*. For Criterion 2, the Recommendation found insufficient evidence that the policy materials were in place or utilized prior to the violation, with no documentation supporting Singh's assertion. *Id*. And for Criterion 3, the documents did not establish any dates of employment or other assurance that the persons listed were actual employees or all employees, and did not include training logs, supporting materials describing the scope of the training, or evidence that the materials were used prior to the violation. *Id*. The Recommendation concluded that permanent disqualification was warranted. *Id*.

The Agency's determination as to permanent disqualification was conveyed in a letter to plaintiff's counsel on May 5, 2020. *Id*. at 113-14 (the "Determination Letter"). The Determination Letter found that the violations had occurred and that plaintiff was not eligible for a CMP. *Id*. at 113. It stated, *id*.: "We have determined that you are not eligible for the CMP because you failed to submit sufficient evidence to demonstrate that your firm had established and implemented an effective compliance policy and program to prevent violations of the Supplemental Nutrition Assistance Program." *Id*. The letter advised plaintiff that, within ten days, the Store had the right to seek review by the FNS Administrative Review Branch. *Id*.

Plaintiff lodged an appeal via a letter of May 18, 2020. *Id*. 116-34. Wow asked FNS to reverse its determination and issue "an official warning letter to the Store, or in the alternative, assess a modest [CMP]." *Id*. at 116. The letter included three exhibits: plaintiff's original reply letter to FNS (ECF 16-2 at 124-29); Singh's Affidavit, attached to the original letter (*id*. at 130-32); and photographs of the sign in the Store. *Id*. at 133-34.

Plaintiff characterized the Determination Letter as containing little analysis of the actual case, and recounted the relevant factual and procedural history. *Id.* at 117. The Store argued that permanent disqualification was unwarranted under 7 C.F.R. § 278.6(d) because the trafficking was carried out by a "rogue employee" without the knowledge of the Store's owners, and it was the first such violation. ECF 16-2 at 118-19. The Store also argued that plaintiff "easily" satisfied the four criteria for a CMP, rather than disqualification. *Id.* at 120-23. After a review of the four criteria, the Store argued that if FNS rejected plaintiff's request, it should at least set the disqualification for a "minimal set period of time," rather than permanently. *Id.* at 123.

The FNS Administrative Review Branch upheld the Agency's initial determination in a Final Agency Decision of August 13, 2020, issued by Administrative Review Officer Ronald C. Gwinn. *Id.* at 143-51. The FAD found that there were no errors or discrepancies as to the investigation itself, and that "[a] preponderance of the evidence indicates that personnel at the store exchanged cash for SNAP benefits." *Id.* at 147. The FAD concluded that although no owner was implicated, this was not a valid basis for dismissing the charges or mitigating their impact. *Id.* Noting that "[t]rafficking in SNAP benefits is an extremely serious violation" warranting permanent disqualification, even for a first-time violation, under statute and regulation, the FAD found that the sanction of permanent disqualification was appropriate. *Id.* Given that the law requires permanent disqualification for a first-time trafficking offense (except if the CMP criteria are satisfied), the FAD held that FNS properly applied the criteria in 7 C.F.R. § 278.6(d). ECF 16-2 at 148. And, the FAD noted that no warning letter was permissible in the case of trafficking. *Id.*

Finally, the FAD analyzed and sustained the Agency's denial of a trafficking CMP. ECF 16-2 at 149-50. The FAD found that plaintiff did not satisfy criteria 1, 2, or 3, listed in 7 C.F.R.

§ 278.6(i), by substantial evidence.[9]  As for Criterion 1, the FAD noted that plaintiff "did not submit written and dated material of the store's internal policy that reflects a commitment to ensuring that the firm is operating in a manner consistent with SNAP regulations and policy. Such . . . material would normally include topics such as the store's termination policy, corrective action process and ongoing internal compliance reviews."  ECF 16-2 at 150.  Instead, plaintiff "only asserted that the firm hangs a SNAP compliance poster in the store and that a conversation about program rules had taken place at some point in the past between a store owner and a single employee."  *Id.*

For Criterion 2, the FAD concluded that plaintiff had presented "insufficient evidence that any policy materials were utilized or in place **prior** to the violations."  *Id.* (emphasis in original).  Singh's assertion that the Store's policy was in place prior to the violation was not supported by any "contemporaneous documentation dated prior to the violations."  *Id.*

As to Criterion 3, the FAD found plaintiff did not meet the factor because "the documents it submitted do not establish any record of dates of employment for firm personnel or dated training curricula and logs."  *Id.*  Furthermore, "[t]here are no supporting materials submitted which describe the scope of the training and there is no evidence any materials were ever used prior to the violation."  *Id.*

This lawsuit followed.  Additional facts are included, *infra*.

---

[9] The FAD actually states: "A review of the case record reveals that the Appellant [plaintiff] *did* establish by substantial evidence that it met Criterion 1, Criterion 2 or Criterion 3 requirements as described in 7 CFR 278.6(i)(1) and (2)." ECF 16-2 at 149 (emphasis added). But, in context, this is obviously a typographical error.

## II. Standard of Review

### A.  Review of the Agency Decision

Under 7 U.S.C. § 2023(a)(13), a SNAP authorized retailer may obtain judicial review of its disqualification by filing suit in federal district court within 30 days after delivery of the final determination notice. Judicial review of an administrative disqualification involves a two-part inquiry.

First, the district court "shall [conduct] a trial de novo" to "determine the validity" of the FNS's finding that the retailer violated SNAP regulations. *Id.* § 2023(a)(15). In the context of SNAP, de novo review means that the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur. *AJS Petroleum*, 2012 WL 683538, at *4. To carry this burden, the plaintiff "may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency." *Redmond v. United States*, 507 F.2d 1007, 1012 (5th Cir. 1975). Thus, in reviewing the agency decision, "the court is not bound by the administrative record . . . ." *Green Apple Grocery and Deli*, 2021 WL 533730, at *5; *see AJS Petroleum*, 2012 WL 683538, at *4 ("In seeking to disprove the violations, [the retailer] is not limited to the factual record before the agency, but may rely on other evidence as well.") (citing *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997)); *see also Negash*, 2018 WL 722481, at *3; *Mahmood*, 2012 WL 3038638, at *2.

Second, courts apply the "arbitrary and capricious" standard to assess the validity of the sanction. *Betefsa, Inc. v. United States*, 410 F. Supp. 3d 132, 138 (D.D.C. 2019) ("Although the validity of the underlying violation is reviewed by trial de novo, 'judicial review of the agency's choice of penalty is focused on whether the [FNS] abused [its] discretion.'"); *see Cross v. United States*, 512 F.2d 1212, 1215 (4th Cir. 1975) (noting that the scope of judicial review extends to

20

the administrative sanction); *see, e.g., Negash*, 2018 WL 722481, at *3; *Mahmood,* 2012 WL 3038638, at *2; *AJS Petroleum*, 2012 WL 683538, at *4; *2341 E. Fayette St., Inc. v. United States*, JFM-05-974, 2005 WL 2373696, at *1 (D. Md. Sept. 26, 2005) (citing *Willy's Grocery v. United States*, 656 F.2d 24, 26 (2nd Cir. 1981)); *see also Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir. 1993); *Bruno's, Inc. v. United States*, 624 F.2d 592, 594 (5th Cir. 1980).

"The arbitrary and capricious standard asks 'whether the determination is unwarranted in law or without justification in fact.'" *Mahmood,* 2012 WL 3038638, at *2 (quoting *Ahmed*, 47 F. Supp. 2d at 393); *see Affum v. United States*, 566 F.3d 1150, 1161 (D.C. Cir. 2009) ("Under the applicable standard of review, the Secretary abuses his discretion in his choice of a penalty if his decision is either 'unwarranted in law' or 'without justification in fact'...") (internal citation omitted). "The plaintiff has the burden of proof on the sanction issue as well." *Shreegi Enterprises, Inc. v. United States*, 1:CV-15-2232, 2018 WL 1919576, at *2 (M.D. Pa. Apr. 24, 2018).

"[O]nly in those instances in which it may be fairly said on the de novo record as a whole that the Secretary, acting through his designates, has abused his discretion by acting arbitrarily or capriciously, would the district court be warranted in exercising its authority to modify the penalty." *Cross*, 512 F.2d at 1218. "[T]he views of the Secretary as to the appropriate sanction in a given case of violation are entitled to very great, if not conclusive, weight." *Id*. "A complaining party is still entitled to a trial *de novo* to create a factual record on the Secretary's determination not to a impose a civil money penalty in lieu of disqualification, and judicial review of the Secretary's choice of penalty is based on that *de novo* record. But the controlling standard of review is abuse of discretion." *Affum*, 556 F.3d at 1161 (emphases in original).

"Thus, in a case such as this, the District Court obviously must consider, *inter alia*, whether the Secretary reasonably weighed the statutory factors listed in § 2021(b)(3)(B), (B)(i), (B)(ii)(I), and (B)(ii)(II) and reasonably applied any lawful regulations adopted pursuant to § 2013(c) and § 2021(a)(2)…in denying [plaintiff's] request for a civil money penalty in lieu of disqualification." *Id*. at 1161-62. "Even in those instances in which a district court may find on de novo review that the Secretary erred in his determination of the fact and gravity of the violations, it would be incumbent on the district court to prescribe an alternate penalty, not on the basis of what it, in the exercise of its judgment, would consider reasonable and just, but within the guidelines set by the Secretary for the enforcement of the Act." *Cross*, 512 F.2d at 1218-19.

The trial de novo provision of 7 U.S.C. § 2023(a)(13) does not, however, entitle plaintiffs to a trial on the merits as to their cause of action. *Mahmood*, 2012 WL 3038638, at *2 (emphases in original). Indeed, as mentioned, numerous courts have noted that "'summary judgment is a proper means of disposing of a request for review under 7 U.S.C. § 2023(a)(13), where there are presented no genuine issues of material fact.'" *Id*. (quoting *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 599 (E.D. Va. 2000)); *see also Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8; *J&K Deli, Inc. v. United States*, JMC-19-3282, 2021 WL 1102344, at *5 (D. Md. Mar. 22, 2021) (Coulson, M.J.); *7-Eleven, Inc.*, 2016 WL 5107129, at *1-4. Furthermore, "[w]hether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment." *Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8 (quoting *Duchimaza v. United States*, 211 F. Supp. 3d 421, 439 (D. Conn. 2016)) (alteration in *Brother Convenience Store, Inc.*).

## B.  Motion for Summary Judgment

As noted, the Motion is styled as a "Motion to Dismiss Or, In the Alternative, For Summary Judgment."  ECF 16.  A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[10]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not

---

[10] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

consider it."  5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id*.

Summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011).  As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask."  *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'"

*Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit…is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods,* 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

Plaintiff has not filed a Rule 56(d) affidavit.  Nor does the Opposition contain a request for discovery.  Moreover, the Opposition does not identify any material that might be sought via discovery.  But, Wow argues that the Court should "allow the case to proceed to a de novo hearing on the issues presented regarding the government's arbitrary and capricious permanent disqualification of Plaintiff from the SNAP program."  ECF 23 at 11-12.

The government has submitted a comprehensive Administrative Record.  Plaintiff explicitly "adopts and incorporates by reference" both the Administrative Record and the Statement of Facts in the Motion, which is derived from the Administrative Record.  ECF 23 at 3.  The Complaint includes one exhibit, the FAD. ECF 1-1. This exhibit is also part of the Administrative Record. *See* ECF 16-2 at 143-51.  Notably, plaintiff has not challenged the Administrative Record in any way.  Nor has the Store sought to amplify the record.

"As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). "[A] *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Id.* (emphasis in original). But, plaintiff's Complaint is not verified. *See* ECF 1.

In light of the foregoing, it is appropriate to construe the Motion as one for summary judgment, rather than as a motion to dismiss.  This approach aligns with that taken in numerous cases in this District, and elsewhere, regarding review of SNAP retailer violations.  *See, e.g.*, *Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8; *Green Apple Grocery and Deli v. United States Dep't of Agriculture*, RDB-19-1408, 2021 WL 533730, at *6 (D. Md. Feb. 12, 2021); *Negash v. United States*, RDB-17-1954, 2018 WL 722481, at *4 (D. Md. Feb. 5, 2018),

*aff'd*, 772 F. App'x 34, 35-36 (4th Cir. 2019) (per curiam); *7-Eleven, Inc. v. United States*, GLR-15-543, 2016 WL 5107129, at *2 (D. Md. Jan. 29, 2016); *Mahmood v. United States*, WMN-12-0228, 2012 WL 3038638, at *2 (D. Md. July 24, 2012); *AJS Petroleum*, 2012 WL 683538, at *5.

### C. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Market Development Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, it must support its factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials...." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, as just discussed, or "the burden on the moving party may [also] be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact." *Brother Convenience Store, Inc. v. U.S. Dep't of Agriculture*, GLR-20-1346, 2021 WL 3911594, at *8 (D. Md. Sept. 1, 2021) (citing *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586-87). Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24.  As indicated, the court must view all of the facts, including any reasonable inferences to be drawn, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is

appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Where there is conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

### III. Discussion

Defendant first argues that plaintiff is unable to satisfy its burden that trafficking did not occur.  ECF 16-1 at 19-21.  Second, the government argues that the Agency's decision as to permanent disqualification of plaintiff is mandated by statute and not arbitrary or capricious.  *Id*.

at 21-24. Plaintiff responds principally that the Agency's decision as to permanent disqualification is arbitrary and capricious. ECF 23 at 4-12.

### A.

As noted, the district court must "determine the validity" of the FNS's finding that the retailer violated SNAP regulations. 7 U.S.C. § 2023(a)(15). In the context of SNAP, the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur. *AJS Petroleum*, 2012 WL 683538, at *4. Defendant, as the moving party, may show it is entitled to summary judgment by relying on evidence in the record or an absence of evidence to support plaintiff's case. *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 325. Although the Court may go beyond the administrative record on de novo review, plaintiff has not supplemented the Administrative Record, nor identified any way in which it might attempt to do via discovery.

In the Complaint, plaintiff alleges that the Agency "erroneously found that Plaintiff had trafficked in SNAP benefits warranting permanent disqualification from the SNAP program" (ECF 1, ¶ 35) and seeks reversal of the Agency's Determination Letter and FAD as a whole. *Id.* ¶ 41. But, in the Opposition plaintiff has abandoned that claim; the Store does not dispute that a trafficking violation has occurred. The Opposition states: "The sole issue before this Court is whether FNS abused its discretion in disqualifying WOW from the Food Stamp Program under 7 U.S.C. § 2021(b). . . . WOW does not dispute that a rogue, now-terminated employee committed the violation; rather, WOW contests the harshness of the imposed permanent disqualification as opposed to imposition of the otherwise permissible civil monetary penalty." ECF 23 at 4.

In any event, the undisputed facts make clear that plaintiff cannot meet its burden to show that no trafficking violation occurred. "Trafficking" is defined in pertinent part as "buying,

selling, stealing or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards ... for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone."  7 C.F.R. § 271.2.  It is undisputed that Diallo did precisely that in his transaction with the FNS investigator, exchanging the investigator's SNAP benefits for $150 in cash, as described in the Report of Positive Identification.  *See* ECF 16-2 at 86-87.

Wow has not cited any evidence creating a genuine dispute of material fact on this point. Plaintiff's letter to the FNS noted that Singh "acknowledge[d] that the alleged transaction constitutes trafficking in violation of 7 USC § 2021."  *Id*. at 102.  Its appeal letter likewise acknowledged the trafficking occurred.  *Id*. at 118-19.  And, as noted, in its Opposition, plaintiff "does not dispute that a rogue, now-terminated employee committed the violation."  ECF 23 at 4.

Thus, the government is entitled to summary judgment on the issue of a violation of the SNAP regulations by plaintiff.

### B.

The Court must next consider the sanction of permanent disqualification imposed by FNS.  Review is premised on the arbitrary and capricious standard.  Notably, "[w]hether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment."  *Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8 (quoting *Duchimaza*, 211 F. Supp. 3d at 439) (alteration in *Brother Convenience Store, Inc.*).

"The arbitrary and capricious standard asks 'whether the determination is unwarranted in law or without justification in fact.'"  *Mahmood,* 2012 WL 3038638, at *2 (quoting *Ahmed*, 47 F.

Supp. 2d at 393). "[T]he views of the Secretary as to the appropriate sanction in a given case of violation are entitled to very great, if not conclusive, weight." *Cross*, 512 F.2d at 1218.

As the Fourth Circuit said in *Cross*: "[O]nly in those instances in which it may be fairly said on the de novo record as a whole that the Secretary, acting through his designates, has abused his discretion by acting arbitrarily or capriciously, would the district court be warranted in exercising its authority to modify the penalty." *Cross*, 512 F.2d at 1218; *see also Affum*, 556 F.3d at 1161.

Defendant argues that plaintiff's evidence has fallen short of the criteria specified in 7 C.F.R. § 278.6(i) for granting a trafficking CMP in lieu of permanent disqualification, and so FNS did not abuse its discretion. ECF 16-1 at 21-24. In contrast, the Store highlights several alleged flaws in the Agency's process: that it incorrectly believed it lacked the discretion to impose a lesser penalty; that it arbitrarily discounted the "substantial evidence" provided by plaintiff; and that it failed to consider the lack of involvement by Store ownership or management. ECF 23 at 4-11. As a result, plaintiff contends that the permanent disqualification decision was "arbitrary and capricious because it was neither warranted by law nor justified by the presented facts"—or, at least, that "there is sufficient genuine dispute as to the arbitrary and capricious nature of the government's actions [so as to] preclude judgment as a matter of law." *Id*. at 4. Plaintiff also critiques the sparse explanation in the Agency's decision, as provided in its Determination Letter. *Id*. at 7-8.

To be sure, there is no evidence that plaintiff or its owners were involved in, or aware of, the trafficking. But, this is irrelevant for the purposes of finding a violation. As the Fourth Circuit said in *Traficanti*, 227 F.3d at 174-75 (internal citation omitted):

> Congress specifically intended that all owners be subject at least to some penalty,
> regardless of fault. The circuit courts that have examined the question agree that

penalties attach to the owner, regardless of fault. Congress chose such a strict liability regime in order to ensure that the person in the best position to prevent fraud—the owner—had sufficient incentive to stop wayward employees from stealing from the government. It is not the place of the judiciary to disregard the guidelines set by Congress. Even assuming Traficanti's ignorance of the violations, the statutory scheme dictates that he face the consequences for his employee's criminal behavior.

Plaintiff's first alleged flaw in the Agency's decision, that FNS falsely believed it lacked discretion, misses the mark.  In making this argument, plaintiff points to the text of the FAD, allegedly suggesting that the Agency believed it could not issue a "warning letter or lesser term disqualification" because the statute and regulations "mandate[] a permanent disqualification for trafficking on the first violation."  *See* ECF 16-2 at 148.  Plaintiff contends that this is incorrect, given the alternative of a trafficking CMP.  ECF 23 at 8-9, 10.

But, this is not a fair reading of the FAD.  Indeed, the portion of the FAD analyzing a trafficking CMP makes clear that the Agency was well aware that it had the authority to impose a CMP if the criteria were satisfied.  *See* ECF 16-2 at 149-50.

Permanent disqualification is the presumptive sanction where a retailer has trafficked in SNAP benefits. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697; *see also Green Apple Grocery*, 2021 WL 533730, at *7 ("Permanent disqualification is almost always the appropriate sanction where a retailer is caught trafficking in SNAP benefits."). Indeed, "a store that is caught trafficking in food stamps even one time must be permanently disqualified from [SNAP], unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy." *Idias*, 359 F.3d at 697 (citing 7 U.S.C. § 2021(b)(3)(B)); 7 C.F.R. § 278.6(e)(1)(i)).  In *Negash*, 772 F. App'x at 35, the Fourth Circuit reiterated: "'Congress has been quite firm in ensuring that [SNAP benefits] are used only to

purchase eligible food items, and are not exchanged for cash or other things of value.'"   (Citation omitted).

Plaintiff has argued at various points in this case, and in the administrative process, as to the availability of penalties other than permanent disqualification *or* a trafficking CMP.  Count I of plaintiff's Complaint explicitly seeks a warning letter.  ECF 1, ¶¶ 33-41.  And, the Opposition at certain points mentions a warning letter, a hardship CMP, or a reduced term of disqualification.  ECF 23 at 5, 8.  Plaintiff's appeal letter likewise advocated for a warning letter or a reduced period of disqualification, in addition to a trafficking CMP.  ECF 16-2 at 116, 119, 123.

To the extent that plaintiff pursued these sanctions, they are without legal or factual support.  And, because they lack such support, the Agency did not abuse its discretion by refusing to consider them, or suggesting it lacked the power to impose them.

For example, it is true that the SNAP regulations provide, as a general matter, that FNS may elect to send a warning letter "if violations are too limited to warrant a disqualification."  7 C.F.R. § 287.6(e)(7).  But, such an option does not apply in the trafficking context, for which permanent disqualification is mandatory unless the requirements for a trafficking CMP are satisfied.  *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697 ("[A] store that is caught trafficking in food stamps even one time must be permanently disqualified from the Food Stamp Program, unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking policy."); *Traficanti*, 227 F.3d at 174 ("Disqualification is permanent upon the first instance of purchasing or trafficking in food stamps unless the Agriculture Department determines by "substantial evidence" that the store had "an effective policy and program in effect to prevent violations.") (quoting 7 U.S.C. § 2021(b)(3)(B)).

The SNAP regulations also generally contemplate a "hardship waiver," under which "FNS may impose a civil money penalty as a sanction in lieu of disqualification when the firm subject to a disqualification is selling a substantial variety of staple food items, and the firm's disqualification would cause hardship to SNAP households because there is no other authorized retail food store in the area selling as large a variety of staple food items at comparable prices." 7 C.F.R. § 278.6(f).   However, such a CMP "may not be imposed in lieu of a permanent disqualification," which would be the case for a trafficking violation.  *Id.*

As the case law makes clear, the sole alternative to permanent disqualification in this context is the trafficking CMP.  And, in any case, there is no factual material in the record reflecting that the hardship criteria are satisfied as to the Store, nor has plaintiff suggested that it might be able to produce such material.  Moreover, the statute and the regulations generally contemplate permanent disqualification for trafficking.  This is indicative of the seriousness with which Congress has approached such conduct.  *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).

Two of plaintiff's additional arguments—the alleged failure of the Agency to give adequate weight to the lack of owner involvement, and the lack of detail in the Determination Letter—also fall short.  Plaintiff argues that "the lack of owner involvement must guide the decision of which penalty to impose and militates against permanent disqualification."  ECF 23 at 10-11.  However, the requirement is that an "effective policy and program" be in place to prevent violations.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i).  The statute makes clear that owner involvement is an important consideration in assessing whether such a policy and program exists, *see* 7 U.S.C. § 2021(b)(3)(B), and this is reflected in Criterion 4 of the regulations, which relates to knowledge and involvement by firm ownership.  *See* 7 C.F.R. § 278.6(i).

But, as part of demonstrating an effective policy and program, there are three additional criteria, unrelated to owner involvement, that must be satisfied so as to qualify for a trafficking CMP. *See id.* And, "[a]ll four of these criteria must be satisfied [by substantial evidence] in order to impose a [CMP]." *Castillo*, 989 F. Supp. at 418; *see also, e.g.*, *Traficanti*, 227 F.3d at 174 ("The Agriculture Department promulgated four criteria to determine whether a store qualifies for the fine."); *7-Eleven, Inc.*, 2016 WL 5107129, at *3-4 (noting that "[t]he CMP criteria require a firm to provide substantial evidence that establishes its fulfillment of *each* of the [criteria]," and upholding permanent disqualification even when plaintiff "provided evidence . . . that firm ownership was not aware and did not approve of the trafficking violations.").

The handful of out-of-circuit cases cited by plaintiff are inapposite. For example, in *Bakal Bros., Inc. v. United States*, 105 F.3d 1085, 1088-90 (6th Cir. 1997), the court recognized that while an owner's innocence is relevant as to which penalty could be imposed, the statute permits the imposition of permanent disqualification, even for innocent owners, and it upheld such a penalty. *Corder v. United States*, 107 F.3d 595, 596-98 (8th Cir. 1997), reduced the amount of a CMP, in which it was undisputed that the plaintiff was eligible for a trafficking CMP, both because she was innocent and because she already had in place an effective policy and program. And, *Ghosein v. U.S. Dep't of Agriculture*, 616 F. Supp. 857, 858-60 (E.D. Mo. 1985), was decided under the pre-1988 legal framework, and concerned two individuals who exchanged food stamps for cash who apparently were neither owners nor employees of the store in question.

In sum, the lack of owner involvement is certainly a factor to consider in the decision as to a trafficking CMP, but it does not compel the conclusion maintained by plaintiff. It was not

an abuse of discretion for FNS to impose a permanent disqualification penalty, notwithstanding the undisputed lack of involvement by owners of the Store in the trafficking incident.

Finally, plaintiff criticizes FNS for including little rationale or explanation in its Determination Letter as to why plaintiff's response to the Charge Letter as to a CMP was insufficient.  ECF 23 at 7-8; *see also* ECF 16-2 at 113-14 (the Determination Letter).  Plaintiff notes it did not receive a copy of the Agency's internal Retailer Reply and Case Sanction Recommendation (*id*. at 110-12) until defendant submitted the Administrative Record in this case.  Plaintiff asserts that had it received a more complete picture of the Agency's rationale, it could have "responded appropriately and changed its approach for the Administrative Review." ECF 23 at 8.

The Determination Letter is indeed sparse in this regard, simply stating that plaintiff "failed to submit sufficient evidence."  ECF 16-2 at 113.  But, plaintiffs have cited no law for the proposition that failure to provide a more detailed analysis leading to the denial of a trafficking CMP request renders the Determination Letter arbitrary and capricious—that is, "'unwarranted in law or without justification in fact.'" *Mahmood,* 2012 WL 3038638, at *2 (quoting *Ahmed*, 47 F. Supp. 2d at 393).

The lack of detail in the Determination Letter plainly did not prevent plaintiff from sending a fulsome letter making its case as part of the appeal.  *See* ECF 16-2 at 116-34. Plaintiff's appeal letter reflects that plaintiff was well aware of the criteria laid out in 7 C.F.R. § 278.6(i) that it needed to satisfy, and it tailored its argument accordingly.  Nor has plaintiff actually indicated any way that it would have changed its approach for the appeal, nor any additional material or information that it might have provided.  Indeed, no additional material has been produced by plaintiffs in response to the FAD, which contained a detailed explanation.

As defendant notes (ECF 26 at 3), substantially more analysis was provided by the FAD, which is what is subject to judicial review.  Furthermore, the Fourth Circuit has held that a de novo district court hearing "cure[s]" any "procedural due process violation [that] existed at the administrative level" of the SNAP retailer disqualification process. *Traficanti*, 227 F.3d at 175.

Plaintiff's argument that FNS failed to consider the "substantial evidence" it provided as to an effective compliance policy and program, however, deserves a more extended discussion.  I turn to this issue.

## C.

Defendant argues that the evidence presented by plaintiff during the administrative process was insufficient, under the SNAP regulations, to demonstrate that plaintiff had "established and implemented an effective compliance policy and program."  ECF 16-1 at 22-24; 7 C.F.R. § 278(i).  In particular, while it is undisputed that Criterion 4, as to owner involvement, is satisfied, defendant contends that plaintiff's evidence falls short of satisfying criteria 1, 2, and 3.  ECF 16-1 at 22-23.  The government asserts: "In sum, Plaintiff did not produce documentation to FNS demonstrating that the Store had a written compliance policy that was provided to employees prior to the trafficking violation in issue, nor will Plaintiff be able to raise a genuine issue of material fact as to whether it developed and implemented an actual training program."  *Id*. at 24.

In response, plaintiff has not offered any additional evidence or factual material beyond what is in the Administrative Record, nor suggested that such material is available.  Instead, plaintiff argues that the evidence it *has* provided is sufficient to meet the criteria, and complains that this evidence was arbitrarily discounted by the Agency, "without providing any rationale for doing so."  ECF 23 at 5-7, 9-10.  Defendant counters that plaintiff's "threadbare materials"—"a

self-serving declaration and undated store signage"—simply do not satisfy the regulatory criteria. ECF 26 at 3.

It does not appear that there are disputed issues of material fact regarding this issue. I do not take defendant to argue that the facts asserted in Singh's Affidavit are necessarily *false*. Indeed, the government never cites to any material in the record that actually contradicts the assertions in Singh's Affidavit. *Cf.* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").[11] Rather, defendant contends that plaintiff's materials simply are insufficient to meet the stringent requirements of 7 C.F.R. § 278.6(i). But, because defendant has moved for summary judgment, the Court must view all of the facts, including any reasonable inferences to be drawn, in the light most favorable to plaintiff, as the nonmoving party. *Matsushita Elec. Indus. Co., Ltd*., 475 U.S. at 587.

For its part, plaintiff does not dispute the facts. Rather, it disagrees with defendant's characterization of the materials, and their sufficiency in meeting the requirements of the SNAP regulations. For example, plaintiff argues that plaintiff's appeal letter and Singh's Affidavit constitute documentation adequate to meet the regulatory requirements (ECF 23 at 5-6), while

---

[11] Defendant describes Singh's Affidavit, submitted as part of the administrative process, as "self-serving." ECF 26 at 3. "A party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc. v. Hog Slat, Inc*., 954 F.3d 647, 658-59 (4th Cir. 2020) (quoting *Williams v. Giant Food Inc*., 370 F.3d 423, 433 (4th Cir. 2004)). But, if testimony from a non-movant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc*., 700 F. App'x 209, 212 (4th Cir. 2017).

Here, certain portions of Singh's Affidavit could be characterized as self-serving opinion, such as his statement that "[f]rom the beginning, we have taken our obligations to follow the SNAP benefits program's regulations extremely seriously." ECF 16-2 at 106. But, most of his statements are based on personal knowledge or firsthand experience, discussing specific facts about the ways he avers he has approached fulfilling his obligations under the SNAP regulations. *See id*. at 106-07.

the government contends they do not.  ECF 16-1 at 22-23; ECF 26 at 3-4.  But, this is a dispute as to what is required by the regulation, not as to the facts.  *See Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8 ("Whether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment." (quoting *Duchimaza*, 211 F. Supp. 3d at 439) (alteration in *Brother Convenience Store, Inc.*)).

To review, permanent disqualification is the default penalty for a trafficking violation, unless the Agency determines the retailer had in place an effective anti-trafficking policy, in which case it may impose a CMP.  *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697.  To qualify for such a determination, the retailer must submit "substantial evidence" showing that the retailer meets multiple criteria.  *See Idias*, 359 F.3d at 697.  And, "[a]ll four of these criteria must be satisfied [by substantial evidence] in order to impose a [CMP]."  *Castillo*, 989 F. Supp. at 418.

> As noted, the criteria are as follows, 7 C.F.R. § 278.6(i):
>
> Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1); and
>
> Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and
>
> Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and
>
> Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations . . . .
>
> Moreover, 7 C.F.R. § 278.6(i) provides additional detail as to Criterion 1 and Criterion 3.

For convenience of the reader, I restate the provisions.

Regarding Criterion 1, 7 C.F.R. § 278.6(i)(1) provides:

(1) Compliance policy standards. As specified in Criterion 1 above, in determining whether a firm has established an effective policy to prevent violations, FNS shall consider written and dated statements of firm policy which reflect a commitment to ensure that the firm is operated in a manner consistent with this part 278 of current FSP regulations and current FSP policy on the proper acceptance and handling of food coupons. As required by Criterion 2, such policy statements shall be considered only if documentation is supplied which establishes that the policy statements were provided to the violating employee(s) prior to the commission of the violation. In addition, in evaluating the effectiveness of the firm's policy and program to ensure FSP compliance and to prevent FSP violations, FNS may consider the following:

(i)      Documentation reflecting the development and/or operation of a policy to terminate the employment of any firm employee found violating FSP regulations;

(ii)      Documentation of the development and/or continued operation of firm policy and procedures resulting in appropriate corrective action following complaints of FSP violations or irregularities committed by firm personnel;

(iii)      Documentation of the development and/or continued operation of procedures for internal review of firm employees' compliance with FSP regulations;

(iv)      The nature and scope of the violations charged against the firm;

(v)      Any record of previous firm violations under the same ownership; and

(vi)      Any other information the firm may present to FNS for consideration.

With respect to Criterion 3, 7 C.F.R. § 278.6(i)(2) provides:

(2) Compliance training program standards. As prescribed in Criterion 3 above, the firm shall have developed and implemented an effective training program for all managers and employees on the acceptance and handling of food coupons in accordance with this part 278. A firm which seeks a civil money penalty in lieu of a permanent disqualification shall document its training activity by submitting to FNS its dated training curricula and records of dates training sessions were conducted; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s). FNS shall consider a training program effective if it meets or is otherwise equivalent to the following standards:

(i)      Training for all managers and employees whose work brings them into contact with SNAP benefits or who are assigned to a location where SNAP benefits are accepted, handled or processed shall be conducted within one month

41

of the institution of the compliance policy under Criterion 1 above. Employees hired subsequent to the institution of the compliance policy shall be trained within one month of employment. All employees shall be trained periodically thereafter;

(ii)    Training shall be designed to establish a level of competence that assures compliance with Program requirements as included in this part 278;

(iii)    Written materials, which may include FNS publications and program regulations that are available to all authorized firms, are used in the training program. Training materials shall clearly state that the following acts are prohibited and are in violation of the Food and Nutrition Act of 2008 and regulations: the exchange of food coupons, ATP cards or other program access devices for cash; and, in exchange for coupons, the sale of firearms, ammunition, explosives or controlled substances, as the term is defined in section 802 of title 21, United States Code.

As these regulations reflect, there is an expectation of written and contemporaneous documentation to establish "substantial evidence."   "SNAP regulations require that, in the absence of documentary evidence showing certain facts, the FNS must permanently disqualify a firm that has trafficked in SNAP benefits. . . . To avoid disqualification, a firm must submit documentary evidence establishing the criteria set forth in 7 C.F.R. § 278.6(i)."   *Muazeb v. United States*, No. 17-cv-6754, 2019 WL 1613433, at *11 (S.D.N.Y. Mar. 28, 2019).

The Fourth Circuit's holding in *Traficanti*, 227 F.3d 170, is informative.  There, the retailer "had the opportunity to present evidence that he conducted an effective training program to combat food stamp fraud."  *Id*. at 175.  But, "[h]e submitted no documentation to show that he met the four criteria mandated by the regulations."  *Id*.  The Court said: "Store owners cannot simply attest to having effective antifraud programs; rather, they must prove it."  *Id*.  In its view, "Traficanti fell well short of meeting the standards of the statute or the regulations.  The FNS decision not to convert the permanent disqualification into a fine was mandated by statute."  *Id*.

A number of district court cases, decided on the government's motion for summary judgment and in circumstances strikingly similar to those here, demonstrate that documentation,

42

rather than simple assertions, is generally required to qualify for a trafficking CMP. In *Kashif v. United States*, No. 14-cv-30180, 2016 WL 3886164 (D. Mass. May 12, 2016), for example, the plaintiff attempted to demonstrate eligibility for a CMP. *Id*. at *3.[12] The plaintiff asserted that he "'had a policy of training his employees on how to conduct the EBT/Food Stamps transactions. He trained his employees personally.'" *Id*. (internal citations omitted). In addition, the plaintiff "detailed the steps that he took to ensure compliance with the SNAP regulations after he was notified of the violations." *Id*. (internal citations omitted). And, he noted that "he was not involved with the trafficking, [and] that he fired the clerk" who was implicated. *Id*. In a subsequent appeal letter, the plaintiff emphasized that "he owned several convenience stores that participate in SNAP and had no other violations; that he filed a police report outlining the clerk's acts; [and] that he fired the clerk 'immediately' after he learned of the violations." *Id*. (internal citations omitted). He also offered a "written, but undated, compliance policy." *Id*. at *7.

On summary judgment, the court found that plaintiff's "assertions fall far short of making the showing that the regulations require for imposition of a CMP instead of permanent disqualification." *Id*. The court noted that plaintiff "failed to offer the requisite documentation to support these assertions" as to his training policy or program. *Id*. Thus, the court found that plaintiff had not submitted substantial evidence to demonstrate an effective compliance policy, and that FNS did not act arbitrarily and capriciously in imposing the penalty of permanent disqualification. *Id*. at *7-8.

In *Rosario v. United States*, No. 3:14-CV-00907, 2017 WL 4316093 (D. Conn. Sept. 27, 2017), another summary judgment case, the plaintiff retailer "asserted in an affidavit that he had trained employees and would fire them for violations." *Id*. at *4. The court held that this did not

---

[12] This decision was a report and recommendation by a magistrate judge, but it was adopted by the district court. *See Kashif*, 2016 WL 3906579 (D. Mass. July 14, 2016).

constitute substantial evidence sufficient to avoid a sanction of permanent disqualification.  *Id*.  It remarked: "The regulations require the store to provide supporting documentation to comply with the 'substantial evidence' requirement. . . . This includes written, dated documents showing training programs and when they were conducted."  *Id*. (internal citations omitted).

Similarly, in *Nakhle v. United States*, No. 1:19 CV 01470, 2020 WL 6826367 (N.D. Ohio Nov. 20, 2020), the plaintiff retailer "indicated to the FNS that a compliance policy and training program existed," but the only actual evidence he offered "was his own assertion that there were no prior violations."  *Id*. at *9.  The court held that "it is undisputed that plaintiff failed to submit any documentation to the FNS showing that the store had an effective compliance policy, that said policy was in operation before the violations occurred, or that it had a training program for its employees."  *Id*.  Therefore, the court granted summary judgment to defendant as to the penalty of permanent disqualification.  *Id*.

The plaintiff retailer in *21871 Hempstead Food Corp. v. United States*, No. 14 Civ. 00006, 2014 WL 4402069 (E.D.N.Y. Sept. 4, 2014), requested a CMP in lieu of permanent disqualification via a letter stating "that it had an effective compliance policy that had been in effect since 2008, [and] it educated its employees on all aspects of SNAP regulations," but provided no documentation to support these assertions.  *Id*. at 1.  A supplemental response by the plaintiff included a signed and notarized statement from the owner, which described the store's compliance policy, under which "all newly-hired employees view a USDA instructional video about the SNAP program and are instructed 'on a regular basis' that SNAP coupons may be used to purchase only eligible items and may not be exchanged for cash."  *Id*. at *2 (internal citation omitted).  Two signed and notarized statements from store employees were also included, in which the employees "confirmed that they viewed the instructional video and were repeatedly

instructed not to exchange SNAP coupons for ineligible items or engage in trafficking." *Id.* Again, however, no documentation was included. *Id.*

The court granted summary judgment for the defendant, finding "no material factual dispute." *Id.* at *3-4. The court explained that plaintiff "failed to submit documentation warranting the imposition of a monetary penalty. It did not submit a written and dated copy of its compliance policy, which the regulations require. Nor did it submit dated training curricula, dates of training sessions, or contemporaneous documentation of the participation of violating employees in training, which the regulations also require. [Plaintiff] has not provided the requisite 'substantial evidence' of its compliance policy and training program, and the FNS accordingly did not act arbitrarily or capriciously." *Id.* at *3 (quoting 7 C.F.R. § 278.6(i)).

And, in a case in this District, Judge Russell granted the defendant's motion for summary judgment, upholding the penalty of permanent disqualification. *7-Eleven, Inc.*, 2016 WL 5107129, at *2 n.1, 4. Judge Russell noted that the plaintiff retailer had provided evidence of a compliance policy, that ownership was not aware of the violation, and that it was the retailer's first violation. *Id.* at *3. But, the plaintiff had not established that it had instituted an effective personnel training program, and in fact documentation reflected that its employees had not completed SNAP training. *Id.*

During the administrative proceedings, Wow presented two letters from its attorney containing additional information. ECF 16-2 at 101-05, 116-23. The letters included the Singh Affidavit (ECF 16-2 at 106-07), two undated photos of the "Do's and Don'ts" sign displayed in the Store (ECF 16-2 at 109), and the list labelled "Management and Personnel," identifying three individuals and their years of employment at the Store. *Id.* at 108. The Store characterizes these materials as "documentation" and "evidence" (ECF 23 at 5-6, 9) as to its compliance with the

SNAP regulations.  But, as the decisions cited earlier make clear, the "documentation" does not satisfy the criteria.

A review of plaintiff's attempts to satisfy Criterion 1 and Criterion 3, which contain the most detailed requirements, makes clear the extent to which plaintiff has fallen short in meeting the requirements of the regulation.  Criterion 1 requires evidence of an "effective compliance policy."  7 C.F.R. § 278.6(i).  The criterion provides that, "in determining whether a firm has established an effective policy," FNS "shall consider written and dated statements of firm policy," if it is established by documentation that such statements were provided to violating employees *before* the violation.  *Id*. § 278.6(i)(1).  In addition, "in evaluating the effectiveness of the firm's policy and program," FNS may consider other factors.  *Id*.  These include documentation as to the development or operation of a policy to terminate violating employees; documentation as to the development or operation of a policy and procedures for corrective action; documentation as to the development or operation of procedures for internal review of compliance; the "nature and scope" of the charged violations; any previous violations; and "[a]ny other information the firm may present to FNS for consideration."  *Id*.

As the FAD noted accurately (ECF 16-2 at 150), plaintiff submitted no written, dated statement of firm policy, whether established before the violation or otherwise.  Nor has plaintiff submitted any documentation as to the development or operation of a policy to terminate violating employees (7 C.F.R. § 278(i)(1)(i)).  Rather, plaintiff asserted in its appeal letter that such a policy existed, and pointed out that Singh fired Diallo.  ECF 16-2 at 120.  Likewise, plaintiff has submitted no documentation as to the development or operation of policies and procedures as to corrective action (7 C.F.R. § 278(i)(1)(ii)), only an assertion in the appeal letter as to what action plaintiff took in this case.  And, plaintiff has submitted no documentation as to

the development or operation of "procedures for internal review of firm employees' compliance." 7 C.F.R. § 278(i)(1)(iii). Again, plaintiff's appeal letter contains only an assertion as to an intent to do refresher training, along with a reference to the "Do's and Don'ts" signage. ECF 16-2 at 120.

To be sure, this was Wow's first SNAP violation. ECF 23 at 10. Moreover, the Store's owners were not involved in the trafficking and did not benefit from it. Under Criterion 1, FNS may take these facts into consideration, and the FAD does not indicate that FNS did so. *See* ECF 16-2 at 150. But, the regulation does not compel the Agency to do so. *See* 7 C.F.R. § 278(i)(1) ("FNS *may* consider" such factors) (emphasis added). And, given the dearth of other policy or documentation offered by plaintiff as contemplated by Criterion 1, it was not an abuse of discretion for FNS to determine that plaintiff had not satisfied this criterion by substantial evidence on the basis of the factors that it had, in fact, considered.

Moreover, Criterion 3 is problematic. It requires the Store to demonstrate that it had "developed and instituted an effective personnel training program." 7 C.F.R. § 278.6(i). Such a training program is effective if it "meets or is otherwise equivalent to" three requirements. *Id*. § 278.6(i)(2). It should involve training for "all managers or employees whose work brings them into contact with SNAP benefits or who are assigned to a location where SNAP benefits are accepted, handled or processed" within one month of employment, plus periodic retraining. *Id*. § 278.6(i)(2)(i). And, it should "be designed to establish a level of competence that assures compliance with Program requirements as included in this part 278," and use written materials, "which may include FNS publications and program regulations that are available to all authorized firms." *Id*. § 278.6(i)(2)(ii), (iii).

In addition, under Criterion 3, "[a] firm which seeks a civil money penalty in lieu of a permanent disqualification *shall* document its training activity by submitting to FNS its dated training curricula and records of dates training sessions were conducted; a record of dates of employment of firm personnel; and contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s)."  7 C.F.R. § 278.6(i)(2) (emphasis added).

Plaintiff has not satisfied Criterion 3.  In its materials, such as Singh's Affidavit, the Store contends that Singh trains new hires about "the rules and how to accept and process EBT payments."  ECF 16-2 at 106.  But, the Store offered only a vague description of the training, without any further documentation of the particulars of a training program.  *Id*. at 122.  For example, the Store did not submit any training curricula; it did not submit any records of dates when training sessions were conducted; and it did not submit any documentation of the participants in the training.

Arguably, the Store submitted a record of dates of employment of firm personnel, in the form of its list of "Management and Personnel."  *Id*. at 108.  However, this list only includes vague dates of hire: "Est. 2016," "Est. 2016," and "2017."  *Id*.  In addition, as defendant notes (ECF 16-1 at 11-12; ECF 16-2 at 111), the list does not include anyone named "Ali," although on several occasions the investigator encountered a clerk at the Store who identified himself by that name.  *See id*. at 83-93.  Finally, although Criterion 3 contemplates periodic retraining in addition to initial training, 7 C.F.R. § 278.6(i)(2), there is no assertion or indication that such retraining ever occurred.  Rather, following the violation, Singh indicated that he "*intends* to conduct periodic 'refresher' training."  ECF 16-2 at 121 (emphasis added).

It is plain from this review that FNS did not abuse its discretion in finding that plaintiff had not offered evidence, including documentation, sufficient to meet the requirements of at least two criteria under the SNAP regulations. And, "[a]ll four of these criteria must be satisfied [by substantial evidence] in order to impose a [CMP]." *Castillo*, 989 F. Supp. at 418.

To be sure, certain cases discuss the greater flexibility that FNS may apply in some cases, particularly for small retailers. *See Affum*, 556 F.3d 1150; *Ahmed*, 47 F. Supp. 2d 389; *Castillo*, 989 F. Supp 413. These cases support the proposition that, at least in some contexts, it may be arbitrary and capricious for FNS to refuse to consider assertions or evidence in retailer affidavits, even if not all of the documentation requirements in 7 C.F.R. § 278.6(i) are satisfied. *See, e.g.*, *Affum*, 556 F.3d at 1162-65; *Ahmed*, 47 F. Supp. 2d at 390-91, 396-97; *Castillo*, 989 F. Supp. at 414, 418-20.

Indeed, I found these cases persuasive in rendering my decision in *7-Eleven #22360 v. United States*, ___ F. Supp. 3d ___, 2021 WL 4264824 (D. Md. Sept. 17, 2021), in which I granted a preliminary injunction to a retailer that had been permanently disqualified by FNS for trafficking. In that case, however, the retailer provided substantial documentation as to comprehensive initial training. In contrast to the Store here, the evidence was deficient only as to the documentation regarding periodic retraining. *Id*. at *8-9. And, the retailer in that case had been in business, without incident, for 16 years. In addition, the retailer in that case had installed a point of sale computer system that prevented a customer from using SNAP benefits to purchase ineligible items. I concluded, *inter alia*, that, given the evidence and documentation of the initial training program, along with the otherwise spotless 16-year record of the retailer, the retailer was likely to succeed on its claim that permanent disqualification was arbitrary and capricious. *Id*. at *20.

Here, the Store was a SNAP retailer for only about three years before a violation occurred.  ECF 16-2 at 5, 106-07.  Moreover, Singh owns two other convenience stores, so this is not the case of a single, inexperienced store owner, who could not be expected to produce records or to keep abreast of the applicable regulatory regime.  *Id*. at 107.

And, as noted, the issue of the apparent absence of the clerk "Ali" from plaintiff's list of Store management and personnel has never been addressed by plaintiff.  *See* ECF 16-1 at 11-12; ECF 16-2 at 108, 111.  Although Store ownership may not have been aware of the trafficking in which Diallo engaged, Ali seems to have been sufficiently aware of, and comfortable with, Diallo's practice of exchanging EBT benefits for cash, such that he discussed it with the investigator during the investigator's first visit.  *Id*. at 84.  In fact, Diallo's willingness to exchange EBT benefits for cash was apparently sufficiently well known that a clerk at an entirely different store recommended that the investigator visit Diallo.  *Id*.  This hardly suggests a compliance culture at the Store, even if this was plaintiff's first violation.

The FAD took the evidence offered by the Store into account, as it is cited several times.  *See* ECF 16-2 at 150.  But, it found that, given the lack of documentation and other issues, the information did not rise to the level of substantial evidence.  In *Traficanti*, 227 F.3d at 175, the Fourth Circuit said: "Store owners cannot simply attest to having effective antifraud programs." Rather, they "must prove it," and permanent disqualification is mandated by statute when the owner has not done so.  *Id.*

Under the abuse of discretion standard it is the Agency, and not this Court, that has primary responsibility to determine the most appropriate sanction in any given case.  And, "the views of the Secretary as to the appropriate sanction in a given case of violation are entitled to very great, if not conclusive, weight."  *Cross*, 512 F.2d at 1218; *see also Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

In light of the above, I conclude that the Agency's decision to permanently disqualify plaintiff from SNAP, rather than impose a CMP, was not arbitrary and capricious.   Thus, defendant is entitled to summary judgment on the issue of the penalty as well.

### Conclusion

For the foregoing reasons, I shall construe defendant's Motion as a motion for summary judgment and grant it.

An Order follows, consistent with this Memorandum Opinion

Date:  December 9, 2021                                                    _____/s/_____
                                                                                        Ellen Lipton Hollander
                                                                                        United States District Judge